NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180557-U

NO. 4-18-0557

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 1, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| DIANTE LAMAR HARDEMAN, | ) | No. 17CF747 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert L. Freitag, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirms, concluding that (1) the evidence was sufficient to prove defendant guilty of robbery and (2) defendant's right to a speedy trial was not violated.

¶ 2 In July 2017, the State charged defendant, Diante Lamar Hardeman, with robbery (720 ILCS 5/18-1(a) (West 2016)), aggravated battery (*id.* § 12-3.05(c)), and domestic battery (*id.* § 12-3.2(a)(1)). In February 2018, the trial court began a bench trial that ended in May 2018. The court found defendant guilty of robbery, not guilty of the other charges, and later sentenced him to eight years in prison.

¶ 3 Defendant appeals, arguing that (1) the State failed to prove him guilty of robbery because "it did not prove beyond a reasonable doubt that [defendant] intentionally, knowingly, or recklessly deprived [the victim] of her property," (2) defendant's right to a speedy trial was violated when the trial court "granted the State's motions to continue on and after the first day of

trial," and (3) defendant received ineffective assistance of counsel because his trial counsel "agreed to trial dates outside the speedy trial period, failed to assert the speedy trial right as a basis for his objections, and failed to request dismissal on the speedy trial violations." We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5            In July 2017, the State charged defendant with robbery, aggravated battery, and domestic battery. The robbery charge alleged that he knowingly took a handbag and its contents from the person or presence of Hannah Julien by force or by threating the imminent use of force.

¶ 6                              A. The Evidence at Trial

¶ 7            Although defendant challenges the sufficiency of the evidence to sustain his conviction for robbery, he does not challenge on appeal that he took Julien's purse from her person by force; instead, he challenges only that the State did not prove that when defendant did so, he "intentionally, knowingly, or recklessly" deprived Julien of her property. Accordingly, our review of the evidence at trial will be limited to evidence pertaining to that claim.

¶ 8                              1. *The State's Evidence*

¶ 9            On June 25, 2017, Julien was sitting on the steps of the Salvation Army Safe Harbor building in Bloomington. That building had a camera system that recorded the video, but not audio, of the events on that day, and a video from that system was played in open court. The video showed the following.

¶ 10           A dark sedan drives past the steps of the building where Julien is sitting, makes a U-turn, and comes back, stopping across the street from her. The driver, a black male, gets out, crosses the street, and approaches her. (A Bloomington police officer who knew defendant from perhaps a dozen encounters testified that defendant was the black male in the video.) The video

shows defendant kick at Julien as she falls backward, and defendant then stomps down on her. Defendant then picks up her purse, which had fallen to the ground, and walks back to the car. As he does so, Julien gets up, follows him, and seems to be yelling something at him. Before defendant reaches the car, he throws the purse on to the street and appears to have removed something from it. Julien walks on to the street and picks up her purse. Meanwhile, defendant gets into the car and throws some unidentifiable items into the street, which Julien picks up. Defendant then shuts the car door and drives away.

¶ 11    After this incident, Julien sat back on the steps of the building and waited for the police to arrive. A few minutes later, she spoke to the Bloomington police officers who came to the scene.

¶ 12    Julien was a reluctant witness who testified that on the date in question, she was drunk and did not fully remember what had happened. She claimed that (1) she did not remember what she told the police that day and (2) she made a mistake when she told the police that defendant was the person who took her purse. She testified she did not know who it was other than it might have been a friend. She also testified that even after seeing the video, she still did not believe her assailant was defendant.

¶ 13    A police officer testified that he spoke to Julien on the day in question and she told him that defendant was mad at her for telling the police about some of his activities. She also told him that defendant had grabbed her purse and wallet but she had recovered her property and nothing was missing.

¶ 14    The State also introduced into evidence a letter that Julien testified she had written to defendant's lawyer. In that letter, she asked that the charges against defendant be dropped, explaining that "they had history" and she was mad after seeing defendant with another

girl. She also wrote that "they were play fighting" and defendant "is a very sweet person and a great father to his kids."

¶ 15 Joanna Callahan testified that she was employed by Salvation Army Safe Harbor and knew Julien, who was a client and had stayed there on occasion. Callahan explained that the building had a camera system and after the June 25, 2017, incident, she spoke with police and provided them a copy of the video recording. Callahan also testified that she had received a letter, which appeared to be from defendant, in which he wrote that she did not need to come in and testify and that defendant was friends with Julien. In defendant's letter, he also wrote that Julien and he "were friends now" and provided Callahan with Julien's phone number "if [Callahan wanted] to call and ask her any questions."

¶ 16 Tina Phillips testified that she managed inmate correspondence at the McLean County jail and kept a log of correspondence. The State introduced a copy of her logbook that showed that defendant sent a letter to Callahan.

¶ 17 2. *The Defense Evidence*

¶ 18 Defendant, who was the only defense witness, testified that he was working all day on the day in question, and after work, he went to Chicago to see the mother of his child. Defendant testified that he was not the man shown in the video and did not attack Julien. He explained that he wrote the letter to Callahan because he did not want to be convicted for something he did not do. Defendant denied that he and Julien were "play fighting" on the day in question, and he did not know why Julien wrote that.

¶ 19 3. *The Trial Court's Decision*

¶ 20 On this evidence, the trial court first found defendant not guilty of aggravated battery and domestic battery and then found him guilty of robbery. The court explained in some

detail the basis for its conclusion that the State had proved defendant guilty beyond a reasonable doubt, including its observation, as shown by the video, that this incident did not involve "play fighting." Instead, defendant "attacks her, very violently, and then through use of force takes her property away from her and walks away." The court noted that the purse was thrown back and defendant got in the car before tossing another item out. "So it appears as he is walking he takes something out of the purse and then later tosses it out." The court added the following: "There is no question in the court's mind that the victim had her property taken from her by the use of force or threatening the imminent use of force. So, frankly, there is no question in my mind that a robbery took place."

¶ 21    The trial court also noted that defense counsel at least suggested that because nothing was taken or missing—namely, that the victim recovered the items initially taken—that defendant did not have the intent to deprive her of those items, and therefore defendant could not be guilty of robbery. The court rejected that argument, explaining as follows:

"[I]ntent to deprive is an element of theft. It has nothing to do with robbery. But it doesn't have to be proven in the intent to deprive anyone of anything. The elements of robbery are the taking of property by the use of force or threatening the imminent use of force. Whether or not the individual who takes the property intends to keep it or deprive the person of it is irrelevant for a charge of robbery. So, frankly, it doesn't matter that the property was taken and then immediately discarded or returned or anything of that nature. I just don't think that's relevant to the charge."

¶ 22    The trial court later conducted a sentencing hearing and imposed an eight-year extended-term prison sentence upon defendant's conviction for robbery.

¶ 23    B. The Circumstances Surrounding Defendant's Claim That His
Right to a Speedy Trial Was Violated

¶ 24    Defendant was arrested on July 30, 2017, on the charges in this case, but his bench trial did not begin until February 26, 2018. Defendant contends that he was denied his right (1) to a speedy trial under section 103-5 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/103-5 (West 2016)) and (2) to effective assistance of counsel when his trial counsel "failed to assert and preserve [defendant's] right to a speedy trial." To put defendant's contentions in context, we set forth the various pretrial actions and proceedings that pertain to those contentions.

¶ 25    A complicating factor when discussing the pretrial proceedings in this case is that defendant had five other felony charges pending against him in separate cases in McLean County at the same time. However, the trial court did a commendable job of keeping these various charges separate and making a good record regarding what actions the court, the State, and defendant were taking regarding the charges in this particular case, which was McLean County case No. 17-CF-747. Hereafter, we will refer to this case as simply #747.

¶ 26    1. *Initial Pre-trial Proceedings*

¶ 27    Defendant was arrested on July 30, 2017, and remained in custody through court dates in #747 on August 11, September 22, and October 5, 2017. Defendant contends that no continuances of the trial in this case were requested until October 4, 2017, when the State moved for a continuance. The trial court granted the State's motion the next day over the objection of defense counsel, and the next hearing in this case occurred on November 2, 2017.

¶ 28    The State contends that it was only accountable for the 65-day period between defendant's arrest on July 30, 2017, and October 4, 2017. According to the State, because the defendant made no demand for a speedy trial at the hearing on October 5, 2017, he, in effect,

acquiesced to the State's request for continuance. However, this court need not resolve this matter in order to address defendant's contention that he was denied his right to a speedy trial. Accepting (1) defendant's calculation of his time in custody and (2) that he was not responsible for any delays, when the court next conducted a hearing on this case on November 2, 2017, 25 days remained on the clock for the State to bring defendant to trial under section 103-5 of the Code.

¶ 29                              2. *The November 2, 2017, Proceeding*

¶ 30            On November 2, 2017, the trial court conducted a status hearing on five of the cases then pending in McLean County against defendant. He appeared personally and with private counsel who had recently entered his appearance in one of the cases. An assistant public defender, who was defendant's counsel on all of the other cases, also appeared. (Hereafter, we will refer to this assistant public defender, who was the same public defender for defendant throughout this trial, as the PD.) Private counsel explained that he needed a continuance on the case in which his firm was representing defendant and requested December 20, 2017, for a status hearing on that case.

¶ 31            The PD, who was still representing defendant in #747, informed the trial court that defendant intended to retain the same private counsel to represent him in #747, but counsel had not yet entered his appearance. The PD informed the court that "it's the defendant's wish that we take [case #747] off the jury calendar [and] set that for a status December 20 also so [defendant] can retain [the same private counsel he had representing him in the other case]."

¶ 32            The trial court agreed with that request and continued the matter over the objection of the prosecutor, who stated that he was ready for trial. The court concluded by stating that "the [c]ase will be set December 20 at 10 a.m. for status."

¶ 33                              3. *The December 20, 2017, Proceeding*

¶ 34            On December 20, 2017, the trial court again conducted a hearing involving all of the cases pending against defendant. Present again was the private counsel who was representing defendant in one of those cases, as well as the PD who was representing defendant in #747 and in four of the others. Despite the PD's indication on November 2, 2017, that private counsel would be entering his appearance in #747 and replacing the PD, that did not happen, and the PD's representation continued on behalf of defendant in #747. Neither the court, the lawyers, nor defendant discussed the proposed change of representation that was stated as likely to occur in the last hearing on November 2, 2017.

¶ 35            The PD informed the trial court that he was going to move to continue three of the cases pending against defendant but defendant wanted #747 set for trial. Defendant personally confirmed that the PD's representations were correct and that he wanted "just the robbery case" allotted for trial. The court then stated, "I assume you want a jury trial; is that right?" Defendant responded, "Yes, sir."

¶ 36            The trial court then discussed scheduling the jury trial and suggested a trial date of January 17, 2018. When the court asked the PD if that was agreeable, he responded, "If I have to move to continue it, I will, but that's going to work." The court then noted it had mistakenly stated that the first day of the trial term would be January 17 when in fact it would be January 16, 2018. So, the court and the PD agreed that the date for defendant's jury trial in #747 would be January 16, 2018. The court also indicated that defendant's "next actual court date is January 11 at 11 a.m. for a final pretrial."

¶ 37                              4. *The January 11, 2018, Proceeding*

¶ 38            On January 11, 2018, the parties informed the trial court that they had reached a

plea agreement to resolve #747, and the court admonished defendant pursuant to Illinois Supreme Court Rule 402 (eff. July 1, 2012) before accepting his guilty plea. When the court asked for a statement of the plea agreement, defendant asked, "Does this mean everything else is dropped?" When the court explained that State was dismissing only the other two charges in the indictment against defendant—namely, aggravated battery and domestic battery—defendant said, "No, I mean like the retail [theft] and all that other stuff?"

¶ 39　　　　The PD then stated that regarding the three other pending cases against the defendant on which the PD was defendant's counsel, he believed that the State had indicated a willingness to enter into a plea agreement for concurrent sentences in those cases. However, private counsel still represented defendant in one of the pending cases, and private counsel was not present.

¶ 40　　　　The trial court then explained to defendant that "the only case I have in front of me today is the one right here where you are charged with robbery, aggravated battery, domestic battery." Defendant responded as follows: "I didn't know that. I only was going to plead out if they was [*sic*] going to drop the other charges." The court in turn said, "All right. So you want your case to stay on for jury next week?" Defendant responded, "Yeah, bench trial."

¶ 41　　　　The trial court then asked the PD if that representation was correct, and he responded that he and defendant had discussed the matter and defendant indicated he wished to have a bench trial if a trial was going to be held.

¶ 42　　　　The trial court then explained to defendant about the right to a jury trial he was giving up and determined that defendant understandingly and voluntarily waived that right. The court then discussed scheduling the bench trial and explained that because there would be a jury trial the next week, the court would not be able to hear the case then. When the State suggested

to the court that the trial might only be a half day long, the court responded, "The first half day I have is February 26 at 1:30 p.m. Do you want me to set it there?" The PD and the State both indicated that date was agreeable.

¶ 43                    5. *The February 26, 2018, Proceeding*

¶ 44          On February 26, 2018, the trial court called the matter for a bench trial, and the parties indicated they were ready for trial. Before proceeding with evidence, the prosecutor told the court that he had informed the PD of "the State's intention in trying to bifurcate this trial." The prosecutor explained as follows:

> "We have two witnesses in terms of [the need] to lay the foundation for [the] Safe Harbor video. They are Joanna Callahan and Robert Holland. And as far as Robert Holland, he had chemotherapy today and will not be able to attend. Because he's not able to attend, the other case manager has to oversee video. They're not available, [Y]our [H]onor. And I let [the PD] know, and I'm not sure whether he has any objection to that."

¶ 45          The PD responded that he understood the reason for the State's motion to continue. He added that he "would prefer to resolve the case today, but I would leave that to the court's discretion." The prosecutor then represented that he had two witnesses who were ready to testify—namely, Hannah Julien (the victim) and Jerimiah Liebendorfer, a Bloomington police officer.

¶ 46          The trial court stated its understanding that the State was ready to proceed with the exception of the two named witnesses and was asking the court, at the conclusion of that day's evidence, to continue the trial to another day to allow the State to secure the attendance of the other two witnesses. The State said that was correct, and the PD stated his objection to

proceeding in that fashion.

¶ 47       The trial court then granted the State's request to proceed with the available evidence for the bench trial that day and noted that, given the medical problems, it appeared that the State was acting in good faith in making the request it did.

¶ 48       The State then presented the testimony of Julien and Liebendorfer. Liebendorfer was dispatched to the Salvation Army Safe Harbor in Bloomington on June 25, 2017, and was the first officer to speak to Julien about the incident that occurred on the steps of that building earlier that day. After they testified, the trial court directed that the bench trial would be continued to March 28, 2018, at 2:15 p.m. for further evidence.

¶ 49                     6. *The March 28, 2018, Proceeding*

¶ 50       When the trial court called the case for bench trial on March 28, 2018, the State filed a written motion for continuance to which defendant objected. In support of its motion, the State informed the court that two of its witnesses "are sick. One of them has cancer treatment, and he has said that he is not available this week or next week." The State also represented that the other witness was unavailable because of a medical procedure. In response, the court noted that it believed the request to continue was legitimate, but it was concerned about the need to get this case resolved. It ruled that it would "allow one more continuance, over objection." After discussing scheduling with counsel, the court then set the matter for bench trial to be continued on April 24, 2018, at 1:30 p.m.

¶ 51                     7. *The April 24, 2018, Proceeding*

¶ 52       On April 24, 2018, the bench trial resumed, and the State called its last two witnesses, Joanna Callahan and Bloomington police detective Jeffrey Engle. Callahan testified about the camera system inside and outside of the Salvation Army building where the incident

- 11 -

occurred, and her testimony laid a foundation for the admissibility of the video recording. Callahan also testified about a letter she had received purportedly from defendant. Engle testified that after he had reviewed the video, he identified the person in it who struck Julien as defendant.

¶ 53 The State informed the trial court that it had a last witness it wished to call, who handled all correspondence from the inmates at the McLean County detention facility, but she was unavailable on that day. Over defendant's objection, the court continued the bench trial until May 1, 2018, so the additional witness would be available.

¶ 54                                    8. *The May 1, 2018, Proceedings*

¶ 55 On May 1, 2018, Phillips testified and laid the foundation for the admission of the letter defendant wrote to Callahan while he was in the McLean County jail. The State then rested, and defendant testified as earlier noted.

¶ 56 Defendant's testimony concluded the evidence in the case, and the trial court thereafter found defendant guilty of robbery but not guilty of domestic battery and aggravated battery. The court later sentenced defendant to eight years in prison.

¶ 57                                    II. ANALYSIS

¶ 58 Defendant appeals, arguing that (1) the State failed to prove him guilty of robbery because "it did not prove beyond a reasonable doubt that [defendant] intentionally, knowingly, or recklessly deprived [the victim] of her property," (2) defendant's right to a speedy trial was violated when the trial court "granted the State's motions to continue on and after the first day of trial," and (3) defendant received ineffective assistance of counsel because his trial counsel "agreed to trial dates outside the speedy trial period, failed to assert the speedy trial right as a basis for his objections, and failed to request dismissal on the speedy trial violations." We disagree and affirm.

¶ 59          A. Defendant's Claim That the State Failed To Prove Him Guilty of Robbery

¶ 60          Defendant first argues that the State did not prove him guilty of robbery beyond a reasonable doubt because it failed to prove that he "intentionally, knowingly or recklessly deprived [the victim] of her property." As we mentioned earlier, defendant does not contend on appeal that the evidence was insufficient to prove that he took property from the person or presence of another by the use of force. Instead, his argument is based solely on his claim that the State's evidence must show that he took the property with "intent (or other relevant mental states[,] such as knowledge or recklessness) to permanently deprive a person of the taken property."

¶ 61          In making this argument, defendant primarily relies upon *People v. Jones*, 149 Ill. 2d 288, 595 N.E.2d 1071 (1992). However, *Jones* is distinguishable from this case because although the defendant in *Jones* was charged with armed robbery, the trial court in a bench trial found the evidence insufficient to prove the presence of a weapon or threat of force, but the court found that the defendant was guilty of theft. *Id.* at 290-91. So, the issue in *Jones* was whether theft was a lesser included offense of robbery to permit the defendant's theft conviction to stand. The Illinois Supreme Court concluded that the information charging the defendant with armed robbery "sufficiently alleged both the conduct and the mental states required for the lesser offense of theft." *Id.* at 295. The court explained its conclusion, in part, as follows:

          "When a robbery is committed or attempted, common sense dictates that the perpetrator either 'intends to deprive the owner permanently of the use or benefit of the property; or [k]nowingly uses, conceals[,] or abandons the property in such manner as to deprive the owner of such use or benefit; or [u]ses *** the property knowing such use *** probably will deprive the owner permanently of such use

- 13 -

or benefit.' [Citation.] Therefore, the mental state required in the second portion of the theft statute was implicitly set forth in the information charging [defendant] with armed robbery." *Id.* at 297-98.

¶ 62 The supreme court also approvingly cited *People v. Beck*, 42 Ill. App. 3d 923, 924, 356 N.E.2d 848, 850 (1976), where the appellate court wrote that "[i]t would be contrary to experience and reason to conclude a stranger would *** take money from another stranger without fully intending to permanently deprive the wronged party of the money." *Jones*, 149 Ill. 2d at 298. The supreme court then concluded as follows: "[The defendant] clearly was not unfairly surprised or unfairly taken advantage of when he was convicted of theft rather than armed robbery." *Id.*

¶ 63 Based upon *Jones*, defendant claims the element of a defendant's intent to permanently deprive the victim of the property taken during a robbery is now present in that crime. We disagree because the issue in *Jones* was not whether the intent to permanently deprive is *always* an element of robbery; instead, the issue was whether that element could be reasonably inferred from a robbery charge to justify finding a defendant guilty of theft as a lesser offense without unfairly surprising or taking unfair advantage of him.

¶ 64 Our conclusion is further supported by *People v. Banks*, 75 Ill. 2d 383, 387, 388 N.E.2d 1244, 1246 (1979), in which the Supreme Court of Illinois addressed the precise issue before us and wrote that despite the common law, "[a] literal reading of sections 18-1 and 18-2 of the Criminal Code of 1961 [citation] *** indicates permanent deprivation is not an essential character of the crime of robbery." The supreme court suggested a good reason for this omission is because "[i]t would be a dangerous policy indeed were the law to countenance the forcible but temporary taking by one person, with a claim or demand, real or imagined, from another." *Id.* at

- 14 -

388. The court in *Banks* further noted that its earlier cases defining robbery simply did not mention permanent deprivation. *Id.* Four years later in *People v. McCarty*, 94 Ill. 2d 28, 33, 445 N.E.2d 298, 301 (1983), the supreme court reiterated its holding in *Banks* by citing it approvingly and writing the following: "The essence of the one crime is not the essence of the other: theft is an intended, unauthorized deprivation of the benefit or use of property, while robbery is the use of force in the taking of property, regardless of intent or the anticipated duration of the taking."

¶ 65        In *Jones*, the very case defendant cites as his primary support for his argument in this case, the supreme court discussed both *Banks* and *McCarty* and wrote how in *Banks*,

> "[t]his court found that the length of deprivation of the property was not pertinent
> to the offense of robbery, and therefore specific intent to deprive the victim of his
> or her property was not an essential element of robbery. Thus, this court found
> that the indictment in *Banks*, which alleged that the defendant committed robbery
> 'in that [he] did take property, being two (2) rings *** by the use of force,' was
> sufficient and that the robbery charges against the defendants should not have
> been dismissed." *Jones*, 149 Ill. 2d at 299.

¶ 66        Indeed, the supreme court in *Jones* even added the following: "*Banks* stands only for the proposition that robbery is properly charged even where the perpetrator intends to return the property taken from the victim." *Id.* Also in *Jones*, the supreme court provided an analysis that clarifies why its decision in that case—namely, whether theft was a lesser included offense of robbery—provides no support for defendant's argument here:

> "[I]n *Banks*, the court found that a charging instrument need not *expressly* allege
> all of the elements of the crime for which the defendant is convicted. Rather, as

found in *Banks*, a charging instrument may be sufficient if the elements of the crime can be inferred from the language of the charging instrument. In the case at bar, we focus on the information and find that the essential elements of theft can be inferred from the language of that charging instrument." (Emphasis in original.) *Id.* at 300.

¶ 67 Significantly, the supreme court in *Jones did* construe the robbery statute as implicitly requiring that the taking of property be done with either intent, knowledge, or recklessness as "an element of robbery even though the statutory definition of robbery does not expressly set forth a mental state." *Id.* at 297. Given the discussion of the supreme court in *Jones* regarding the elements of robbery, we conclude that the supreme court had the opportunity, which it clearly declined, to similarly conclude that the element defendant argues should be present in the robbery statute—namely, to permanently deprive the victim of the property—is "implicitly" contained in that statute. The supreme court clearly chose not to so conclude.

¶ 68 We also find support for our conclusion in this case in the Illinois Pattern Jury Instructions, Criminal, No. 14.01 (approved Jan. 24, 2014) (hereinafter IPI Criminal 14.01). We note that IPI 14.01, defining robbery, and its Committee Note, read as follows:

"14.01

Definition Of Robbery

A person commits the offense of robbery when he [(intentionally) (knowingly) (recklessly)] takes property from the person or the presence of another by the use of force or by threatening the imminent use of force.

Committee Note

720 ILCS 5/18-1 (West, 1992) (formerly Ill.Rev.Stat. ch. 38, § 18-1

(1991)).

Give Instruction 14.02.

In *People v. Jones*, 149 Ill. 2d 288, 297, 595 N.E.2d 1071, 1075, 172 Ill.Dec. 401, 405 (1992), the Illinois Supreme Court held that 'either intent, knowledge or recklessness is an element of robbery even though the statutory definition of robbery does not expressly set forth a mental state.' Accordingly, the Committee has modified this instruction to include those three mental states as alternative elements of this offense.

Specific intent to permanently deprive is not an element of the offense of robbery. *People v. Banks*, 75 Ill. 2d 383, 388 N.E.2d 1244, 27 Ill.Dec. 195 (1979)."

¶ 69 IPI Criminal 14.01 has been used for decades, and no court has questioned the correctness of its definition of the crime of robbery. This court will not be the first to do so.

¶ 70 B. Defendant's Claim That His Right to a Speedy Trial Was Violated

¶ 71 Next, defendant argues that his right to a speedy trial was violated. Specifically, he argues that right was violated when (1) the trial court granted the State's motions to continue on and after the first day of his bench trial and (2) his trial counsel was ineffective because he failed to assert defendant's right to a speedy trial or to request dismissal. We reject both of these contentions.

¶ 72 We earlier set forth in detail the circumstances surrounding defendant's claim that his right to a speedy trial was violated and will not repeat that discussion. Suffice it to say that even if we accept (1) defendant's calculation of his time in custody and (2) that he was not responsible for any delays, then when the trial court conducted the hearing in this case on

- 17 -

November 2, 2017, 25 days remained in which the State had to bring defendant to trial. And the record shows that defendant was in fact brought to trial within that time.

¶ 73    On November 2, 2017, the PD informed the trial court that defendant wanted to take the case off the jury calendar and set it for a status hearing on December 20, 2017, so that defendant could retain the same private counsel he had representing him in another felony case then pending in McLean County. The court granted that request and continued the matter over the objection of the State, stating that the case would be set on December 20, 2017, for a status hearing. Clearly, this delay from November 2, 2017, to December 20, 2017, was attributable to defendant.

¶ 74    When the trial court called the matter for a hearing on December 20, 2017, the PD continued as counsel for defendant and informed the court that defendant wanted "just the robbery case" allotted for trial. The court ultimately then set the case for trial on January 16, 2018, and the PD agreed with that allotment. Again, the delay until January 16, 2018, was attributable to defendant.

¶ 75    Later in January, the trial court was informed that the parties had reached a plea agreement, but ultimately defendant withdrew from that agreement and stated he wanted a bench trial. In response, the trial court stated that its first available half-day for a bench trial was February 26, 2018, and asked the parties if they wanted the court to set it on that date. The PD and the State both indicated their agreement. So, yet again, the delay of trial until February 26, 2018, was attributable to defendant.

¶ 76    Thus, when the trial court called the matter for a bench trial on February 26, 2018, the same 25 days remained on the speedy-trial clock that were there on November 2, 2017. Prior to starting the bench trial on that date, the State informed the court that it wished to "bifurcate"

the trial by calling two witnesses on that day and then calling two other witnesses at a later time. The State explained two of its witnesses were unable to testify that day for medical reasons. The court granted the State's request over defendant's objection, and two witnesses testified. The court continued the bench trial to March 28, 2018, but on that date it granted the State's motion to continue because the witnesses were still medically unavailable with one of them receiving cancer treatment. The trial court granted the State's request over defendant's objection, and the bench trial was completed on April 24, 2018.

¶ 77          We emphasize that when the bench trial in this case began on February 26, 2018, the speedy-trial clock still contained 25 days. Thus, defendant's peculiar claim that his right to a speedy trial under section 103-5 of the Code was violated is based upon his assertion that even though the trial court began the bench trial on that date, bifurcating the bench trial so that additional State's witnesses could testify later (at a time more than 25 days after the beginning of the bench trial), somehow violated the statute. This claim is completely without merit.

¶ 78          Not surprisingly, defendant cites no authority whatsoever that once a trial court has begun a trial, any continuances of the proceedings (which might be completed after the 120-day clock has run) would constitute a violation of section 103-5 of the Code. Instead, defendant cites multiple cases that are wholly irrelevant to the circumstances of this case. The cases defendant cites all deal with circumstances in which a defendant's trial did not *begin* within 120 days of his custody and the prosecutor asked for an extension of the speedy trial term to bring in witnesses who were not available when the speedy-trial term was otherwise going to run.

¶ 79          Not one of the cases defendant cites is remotely similar to what happened in this case—namely, the trial court *began* the bench trial in a timely fashion and, in the exercise of its

discretion, bifurcated the proceedings for the testimony of some State witnesses at a later date. Almost 50 years ago, the Supreme Court of Illinois in *People v. Williams*, 59 Ill. 2d 402, 405, 320 N.E.2d 849, 850 (1974), concluded that section 103-5 of the Code "was satisfied by *beginning* the process of selecting the jury for the trial of the case" on day 119 of the speedy trial term. (Emphasis added.) The trial in that case was not completed for seven days, which was then six days after the speedy trial term would have run. Not surprisingly, even though the State cited *Williams* in its brief, defendant's reply brief says nothing about *Williams* in response.

¶ 80      Defendant attempts to overcome the State's argument that the bench trial started on February 26, 2018, which was well within the speedy trial term, by asserting that the "continuance" on that date—that is, the trial court's indication that it would approve of the State's request for a bifurcation of the bench trial so that some witnesses would testify on that date and another two of the State's witnesses would testify later—"was not in fact granted after the start of trial, but before trial began." Implicit in this claim is that if the bench trial had begun before the State indicated that it would need to seek a continuance to a later date to complete the bench trial, then the speedy trial statute would not have been violated. This argument is again completely without merit.

¶ 81      Once a trial begins within the 120-day period provided by section 103-5 of the Code, the speedy trial requirement has been satisfied. How long the trial may take and whether there are any continuances of the trial proceedings (within the trial court's discretion) is totally irrelevant to any assessment of whether the speedy trial statute has been complied with.

¶ 82      Because we reject defendant's claim that the 120-day rule had been violated, we also reject completely his claim that his trial counsel was somehow ineffective for not raising it at trial.

¶ 83                             III. CONCLUSION

¶ 84         For the reasons stated, we affirm the trial court's judgment.

¶ 85         Affirmed.